# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| CHRISTAL FISHER & JEREMY FISHER,     ) | |
| Plaintiffs,     ) | |
| v.     ) | Case No.  1:20-cv-01365 |
| ETHICON, INC., & JOHNSON & JOHNSON,     ) | |
| Defendants.     ) | |

## <u>ORDER & OPINION</u>

Defendants' Motions in Limine (docs. 102, 103, 106) are before the Court. Plaintiffs have responded (docs. 116–118). The Court held oral argument on the instant Motions on August 19, 2022, and limited argument to the following issues:

1. Dr. Kohli's expert testimony about the safety of the surgical technique used to implant the mesh sling component of the Transvaginal Tension Free Vaginal Tape-Obturator (TVT-O)[1] as it relates to the existence of a design defect. *See infra* Section II.B.1.

2. Dr. Iakovlev's opinions concerning the degradation of the TVT-O's mesh sling other than those based on his "bark theory" of degradation. *See infra* Section III.A.

---

[1] As explained *infra* in Section II.B.1, the implanted mesh sling cannot be separated from the specially designed tools and surgical technique used to implant it; together they comprise the TVT-O product, which Plaintiff claims contains a design defect making it unreasonably dangerous under Illinois law.

3. Dr. Iakovlev's opinions about specific risks of implanting the TVT-O's mesh sling and whether those risks appeared on the relevant Instructions for Use. *See infra* Section III.B.

Based on oral argument, the Court ordered supplemental briefing from each of the parties with regard to the first issue: Dr. Kohli's testimony regarding the surgical technique used to implant the TVT-O's mesh sling. (Docs. 127, 133). The Motions have been fully briefed and are ripe for review. As detailed *infra*, the Motions are granted in part and denied in part.

DISCUSSION

## I.  Defendants' motion in limine no. 15 is granted

In other mesh litigation cases within MDL No. 2327, Plaintiffs have sought to introduce evidence that Defendants engaged in spoliation of evidence relevant to their claims. (Doc. 116). Defendants move to exclude such evidence as irrelevant under FRE 401 and unfairly prejudicial and unnecessarily confusing under FRE 403. (Doc. 103). "Plaintiffs agree in large part, but would request the evidence be allowed if needed to rebut contentions of defendants during the trial of this matter, particularly the destruction of product complaints, potential adverse event reporting, post market surveillance, and reasonably related corollaries of such." (Doc. 116 at 4).

The Court agrees with the parties and will not allow a mini trial on spoliation to confuse the jury. However, Plaintiffs remain permitted to contradict Defendants. For example, if Defendants elicit testimony that they never destroyed product complaints, Plaintiffs may properly introduce evidence that Defendants did destroy product complaints. However, Plaintiffs may not say Defendants destroyed those

2

documents intentionally or in bad faith, as doing so would result in a spoliation mini trial.

Accordingly, Defendant's motion in limine no. 15 is granted. Evidence of alleged spoliation by Defendants is excluded except that Plaintiffs may use pertinent evidence to challenge directly contradictory claims made by Defendants that they did not destroy evidence.

## II. Defendants' motion in limine regarding Dr. Kohli is granted in part and denied in part

Defendants move to exclude certain opinions of one of Plaintiffs' experts, Neeraj Kohli, M.D., M.B.A., under Federal Rules of Evidence 702 and 403, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 57 (1993), and rulings made by Judge Goodwin in the MDL. (Doc. 102-1 at 1).

### A. *Legal Standard*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Federal Rule of Evidence 702 permits qualified expert testimony where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, the *Daubert* inquiry requires the Court to evaluate three things: "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). In other words, expert testimony must be presented by a qualified witness, be "grounded in the methods and procedures of science," and "assist the trier of fact to understand or determine a fact in issue." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) (quoting *Daubert*, 509 U.S. at 590–91) (alterations omitted). "The party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the standard by a preponderance of the evidence." *Id.* at 673.

In examining a *Daubert* challenge, the Court's role is to serve as a gatekeeper of expert testimony by ensuring "the principles and methodology reflect reliable scientific practice"—"the key to the gate is not the ultimate correctness of the expert's conclusions*." Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). If the *Daubert* threshold is cleared, "the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596).

B.    *Analysis*

Plaintiffs have disclosed Dr. Kohli as a both a general and case-specific expert witness. (Doc. 60-1 at 9, 12). Dr. Kohli is a pelvic surgeon and urogynecologist who has extensive experience with pelvic repair surgery, including experience and

familiarity with the insertion technique, efficacy, and risks of the TVT-O. (Doc. 38 at 1; doc. 37-1 at 1, 7–8).

Defendants previously moved to exclude certain general-causation testimony of Dr. Kohli's, and the MDL court ruled on that Motion. *In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2327, 2016 WL 4582233, at *1 (S.D. W. Va. Sept. 1, 2016). Defendants also filed a motion to exclude certain case-specific testimony of Dr. Kohli's (doc. 37), which this Court ruled on last year (doc. 63).

Now Defendants ask the Court to preclude Dr. Kohli from testifying about (1) the TVT-O surgical implantation technique, (2) further clinical studies that would have allegedly demonstrated flaws in the TVT-O, and (3) Defendants' motives, knowledge, and intent, as well as the parroting of corporate documents. As explained *infra*, Defendants' motion is denied as to its first contention but granted as to its second and third.

### 1. Surgical technique for implanting the TVT-O's mesh sling

Defendants argue Dr. Kohli's expert testimony about the safety of the surgical technique used to implant the TVT-O's mesh sling is irrelevant. According to Defendants, the technique used to implant the TVT-O's mesh sling plays no role in determining whether the TVT-O product is defective. Plaintiffs retort, "the unique surgical technique represents an integral part of the product design." (Doc. 117 at 5). Judge Goodwin heard this argument and determined "[t]he relevance of a matter like this is best assessed in context during trial, so I RESERVE ruling on this matter for trial." (Doc. 75-2 at 7).

The crux of the matter is whether the TVT-O's surgical technique and requisite tools are integral to the implantation of the mesh sling such that together they constitute the TVT-O product Plaintiff alleges has a defective design.

The TVT-O's mesh sling is implanted using an "inside-out" surgical technique in which an incision is made in the patient's vagina, then custom helical passers and winged guides are used to move the mesh tape upward, then outward toward her pelvic bones. Defendants admit the TVT-O product is sold as a kit. (Doc. 125 at 35). In that kit, the TVT-O's mesh sling comes attached to its custom helical passers, which only serve to implant the mesh tape using the particular inside-out surgical method listed on the device's instructions for use.

At oral argument, Defendants were asked whether the TVT-O can be implanted using any other surgical procedure. Defendants argued a surgeon could choose to deviate from Defendants' instructions and use a different technique, such as an outside-in method. However, Defendants conceded the outside-in (abdominal-first) method "is not used that much. The abdominal approach just isn't used, and we have not had a lot of cases with abdominal approach." (Doc. 125 at 42). Plaintiffs retorted that using an alternate surgical method would contravene the TVT-O's instructions, the FDA's approval of the TVT-O's implantation method, and the device's intended use. (Doc. 125 at 42). Because the helical passers are custom-designed to insert the TVT-O using the inside-out surgical technique listed on the device's instructions, it would be highly irregular—perhaps even malpractice (doc. 125 at 45)—for a surgeon to attempt to disassemble the TVT-O apparatus, detach the

6

mesh tape, use a tool not designed for use with the product, and alter the tape's attachment site.

The TVT-O's predecessor, the TVT, serves as a useful example. Defendants argued the TVT's mesh sling could be implanted using two different surgical methods: an inside-out (vaginal-first) method or an outside-in (abdomen-first) method that is quite different. (Doc. 125 at 38–39). However, the TVT was not originally sold for outside-in insertion. Defendants had to create new instructions and tools for that. The resulting product, the TVT variation designed for outside-in insertion, was branded the TVT-AA. (Doc. 125 at 41). Obviously, the original TVT kit and later TVT-AA kit differed in that only the latter included the tools and instructions necessary for outside-in implantation.

It becomes clear the product sold by Defendants was not simply a mesh sling doctors used in a variety of manners as they saw fit. Rather, the TVT-O product's design includes not only the mesh sling that remains implanted in a patient's body but inexorably the custom helical passers and specially selected surgical implantation technique with which it was paired. Therefore, Dr. Kohli's opinions regarding the TVT-O implantation procedure and tools are relevant. *See Arevalo v. Coloplast Corp.*, 3:19-CV-3577, 2020 WL 3958505, at *3 (N.D. Fla. July 7, 2020), *appeal docketed*, No. 21-11768 (11th Cir. May 24, 2021) ("the risks associated with implanting in the transobturator region . . . [are] relevant to the [design] defect analysis because the location of the device within the body and the method of insertion are inherent attributes of the device's design."). Defendants' motion is denied as to this issue.

### 2. Clinical studies that would have allegedly demonstrated flaws in the TVT-O

Dr. Kohli's opinion at issue is this: "In my opinion, if clinical trials had been performed, the outcomes and complications in the TVT-O design would have become apparent." (Doc. 102-2 at 30).

Defendants object, saying, "Kohli assumes—with no basis—that all currently known complications and 'flaws' in a medical device would be predicted in hypothetical prior clinical studies. This opinion should be excluded because it is nothing more than his subjective belief and unsupported speculation." (Doc. 102-1 at 7).

Plaintiffs inappositely retort, "Perhaps Dr. Kohli formed his opinion based on the information provided to him from Defendants, which included clinical studies. However, Defendants chose not to ask him about the basis for the opinion in his deposition. Defendants cannot now complain about their failure to explore the topic." (Doc. 117 at 7).

Dr. Kohli's opinion is unsupported. Dr. Kohli has not made any showing that further clinical studies would show the existence of the flaws he alleges in the TVT-O. This is sophistry at its worst. Defendants' motion is therefore granted as to this issue, and Dr. Kohli's opinion that further clinical trials would have revealed TVT-O's flaws is excluded.

### 3. Defendants' motives, knowledge, and intent

The Court already barred Dr. Kohli from testifying as to Defendant's state of mind in its December 2021 Order regarding Dr. Kohli's case-specific testimony (doc.

8

63). Also, the MDL court consistently ruled that experts could not usurp the jury's fact-finding function by (1) providing corporate state of mind testimony or (2) parroting corporate documents. (Doc. 75-2 at 10–11). The Court adopted those rulings pursuant to the parties' joint stipulation. (Doc. 75). Defendants move to confirm the application of that ruling to various statements made by Dr. Kohli. (Doc. 102-1).

Plaintiffs attempt to wriggle out of that prohibition. They argue this testimony should not be excluded because it is not state-of-mind evidence, they plan to also call Dr. Kohli as a fact witness, and his testimony consists of party admissions that are admissible under FRE 801, 401, and 403. (Doc. 117 at 7).

Even a cursory review of the testimony at issue reveals it falls squarely within Judge Goodwin's prohibition of expert testimony regarding Defendant's state-of-mind-, motive-, and intent-testimony, as well as the parroting of corporate documents. (*See* docs. 102-1 at 8–9, 117 at 10–12, 75-2 at 10–11). The Court's ruling barring Dr. Kohli from testifying as to Defendants' motives, knowledge, and intent equally applies to any admissions in corporate documents by Defendants. This is another attempt to allow a "so called" expert to usurp the role of the jury.

The Court adopted Judge Goodwin's ruling for good reason. First, Dr. Kohli lacks firsthand knowledge to support his conclusions, as he was never employed by Defendants. (*See* doc. 102-2). Second, no matter Dr. Kohli's credentials, he cannot divine Ethicon's mental state and therefore is unqualified to testify to Defendants' motive, intent, and state of mind under FRE 702. *See In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008); Fed. R. Evid. 702 ("the expert's

scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence"); *Lewis v. Ethicon, Inc.*, No. 2:12-CV-4301, 2014 WL 186872, at *6 (S.D. W. Va. Jan. 15, 2014) ("Ethicon's knowledge, state of mind, or other matters related to corporate conduct and ethics" "are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury."). Third, because a jury can draw their own conclusions from Defendants' internal documents, permitting an expert like Dr. Kohli to interpret these documents would invade the province of the jury. *Edwards v. Ethicon, Inc.*, No. 2:12-CV-09972, 2014 U.S. Dist. LEXIS 92316, at *10 (S.D. W. Va. July 8, 2014) (finding expert's explanation of company documents not helpful; the jury is capable of reading and interpreting the documents itself).

Defendants' motion is therefore granted as to Dr. Kohli's testimony about Defendants' motives, knowledge, and intent, as well as admissions in corporate documents, all of which is excluded.

### III.  Defendants' motion in limine regarding Dr. Iakovlev is granted in part and denied in part

Defendants move to exclude certain opinions of one of Plaintiffs' experts, Dr. Vladimir Iakovlev, under Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 57 (1993). (Doc. 102-1 at 1). Defendants move to exclude proposed opinions left unaddressed or reserved by Judge Goodwin, whose rulings the Court has adopted with regard to Dr. Iakovlev and other experts. (Doc. 75).

Dr. Iakovlev is an anatomical pathologist and cytopathologist whose central opinions are (1) that polypropylene, including (the related material) prolene used in

the TVT-O's mesh sling, degrades in the body and (2) regarding the warnings given for Defendants' mesh products. (Doc. 106-1).

The relevant legal standard under Federal Rule of Evidence 702 and *Daubert* have been recited *supra* in Section II.A regarding Dr. Neeraj Kohli.

A.   *Dr. Iakovlev's Degradation Opinion*

The Court has adopted Judge Goodwin's ruling as to Dr. Iakovlev (docs. 75, 75-3), which addressed Defendant's argument:

> Ethicon seeks exclusion of Dr. Iakovlev's degradation opinions, which it claims are unreliable. As an initial matter, Ethicon seeks to exclude all of Dr. Iakovlev's degradation-related testimony when in fact, Ethicon disputes the reliability of a specific opinion about degradation bark. Ethicon argues that the "central theory underlying all of Dr. Iakovlev's degradation opinions is that the Prolene in Ethicon mesh products degrades in vivo creating cracks in the degraded Prolene that trap histological stains, which Dr. Iakovlev can detect via light microscopy." Mem. 4 [ECF No. 2070]. A review of Dr. Iakovlev's report shows this is a mischaracterization of his proposed testimony. Dr. Iakovlev's testimony on degradation generally is extensively supported with specific references to the scientific literature and several internal Ethicon documents. His manner of corroborating the scientific literature by performing his own tests to detect degradation is only one facet of his testimony. I will not order a blanket exclusion of Dr. Iakovlev's degradation testimony based on Ethicon's misleading representations.

> I will, however, address Ethicon's specific challenge. Ethicon disputes the reliability of Dr. Iakovlev's opinion that he can detect degradation bark because it traps histological dyes. Ethicon claims this opinion rests on an implicit untested hypothesis, which is inconsistent with the scientific method. Ethicon is basically demanding that Dr. Iakovlev artificially try to replicate degradation with oxidation outside of the body in his lab before he can testify about degradation that allegedly occurred inside the body. The plaintiffs dispute the existence of any untested hypothesis and argue that additional laboratory testing is not necessary to support what Dr. Iakovlev sees from "actual explanted mesh from human beings." Resp. 8–9 [ECF No. 2185].

> While the parties have discussed at length the merits of conducting in vivo testing to artificially replicate degradation in a laboratory setting,

the court has insufficient evidence to evaluate the methodology Dr. Iakovlev actually employed to examine mesh samples that allegedly degraded in vivo. Accordingly, I RESERVE ruling until Dr. Iakovlev's methodology of examining mesh explant samples can be evaluated firsthand at trial.

(Doc. 75-3 at 6–7 (cleaned up)).

Although Judge Goodwin reserved ruling on Dr. Iakovlev's "bark theory" (i.e., recognizing prolene degradation from trapped histological dyes revealing cracks akin to bark on a tree), the Court will rule on it now. And while it is clear Dr. Iakovlev's testimony concerns Defendants' polypropylene-based medical devices, including the TVT-O, it also relates to other devices. Dr. Iakovlev's testimony regarding device degradation is relevant only to the extent it applies to the TVT-O.

Defendants argue Dr. Iakovlev's degradation opinions rest entirely on the observations underlying his bark theory and should therefore be excluded. They challenge Dr. Iakovlev's "bark theory" as unreliable in multiple ways. They allege (1) his bark theory is not generally accepted; (2) Dr. Iakovlev has not replicated his theory in a lab by artificially oxidizing prolene and seeing if it traps histological stain; (3) Defendant's expert, Dr. MacLean, artificially oxidized prolene and it did not trap histological stain; and (4) Dr. Iakovlev's theory is not supported by the scientific literature he relies upon. (Doc. 106-1).

Many courts have addressed these arguments and found, based on analysis the Court finds persuasive, that Dr. Iakovlev's bark theory is not based on sound methodology (due largely to a lack of adequate testing), but that Dr. Iakovlev's other degradation opinions are admissible in that they are supported by other sources. *See, e.g.*, *Enborg v. Ethicon, Inc.*, No. 2:20-cv-02477, 2022 U.S. Dist. LEXIS 47313, at *16–

12

17 (E.D. Cal. Mar. 15, 2022); *Cutter v. Ethicon, Inc.*, 2020 U.S. Dist. LEXIS 74790, 2020 WL 2060342, at *6 (E.D. Ky. Apr. 29, 2020) (excluding Dr. Iakovlev's "bark theory"); *Kaiser v. Johnson & Johnson*, 2018 U.S. Dist. LEXIS 19950, 2018 WL 739871, at *3 (N.D. Ind. Feb. 7, 2018) (allowing Dr. Iakovlev "to testify to his degradation opinions generally" but finding "no evidence . . . to demonstrate that Dr. Iakovlev's 'degradation bark theory' is the product of reliable principles and methods").

Here, the Court finds there has been no control testing of the degradation bark theory, no peer review, and no evidence of general acceptance within the scientific community. Although Dr. Iakovlev concedes his theory can be tested by intentionally oxidizing new prolene to determine whether it degrades and (if so) traps histological stains, he has not performed that testing. While histological stain and light microscopy methodology may be generally accepted in the scientific community, Dr. Iakovlev should have conducted and completed a control in vitro experiment to substantiate the methodology employed to obtain his conclusions about in vivo degradation of polypropylene-based mesh. There is no evidence of such a control experiment.

Additionally, Dr. Iakovlev has admitted he is the first person to propose the "bark theory" that degraded prolene traps stain which is observable using light microscopy and that there is no published scientific literature supporting bark theory outside his own. (Doc. 106-1 at 3–4). His methodology lacks peer review and has not garnered general acceptance by the scientific community, which weigh against its

13

admission. *Hosbrook v. Ethicon, Inc.*, No. 3:20-cv-88, 2022 U.S. Dist. LEXIS 8186, at *7–8 (S.D. Ohio Jan. 11, 2022).

In sum, Dr. Iakovlev's "bark theory" has not been control tested, it has not been subjected to peer review or publication, the rate of error is unknown, and it has not been generally accepted within the relevant scientific community. There simply is not enough evidence that Dr. Iakovlev's thesis is supported by reliable principles and methods to allow him to testify regarding his degradation bark theory.

The Court will therefore grant Defendants' motion as to Dr. Iakovlev's "bark theory" of degradation but deny the motion as to Dr. Iakovlev's other degradation opinions, which Judge Goodwin found to be "extensively supported with specific references to the scientific literature and several internal Ethicon documents." (Doc. 75-3 at 6–7).

B.   *Dr. Iakovlev's Opinions on Warnings*

Dr. Iakovlev's report contains an analysis of the instructions for use (IFU) for various of Defendants' mesh products that claims certain risks were missing or misleading. (Doc. 106-4 at 31–39). Defendants argue these opinions go beyond Dr. Iakovlev's qualifications as a pathologist. (Doc. 106-1 at 13).

Plaintiffs submit they will not have Dr. Iakovlev offer any expert opinions about the adequacy of labeling in the IFU. (Doc. 118 at 13). However, Plaintiffs do not concede that Dr. Iakovlev's opinions regarding mesh risks or complications are inadmissible or that those opinions cannot be relied upon or offered by another expert.

"While an expert who is an obstetrician and gynecologist may testify about the specific risks of implanting mesh and whether those risks appeared on the relevant

14

IFU, the same expert must possess additional expertise to offer expert testimony about what information should or should not be included in an IFU." *In re: Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2327, 2016 WL 4582209, at *3 (S.D.W. Va. Sept. 1, 2016). Dr. Iakovlev is not an expert in the development of warning labels and thus is not qualified to offer expert testimony about warnings. To the extent he opines on what information should or should not be included in an IFU, it is excluded.

In addition, Dr. Iakovlev is also not an obstetrician or gynecologist. Although Dr. Iakovlev has examined at least 500 specimens of explanted mesh (i.e., mesh that had been implanted and later removed from people) and cites a handful of studies addressing mesh implant risks in his expert report, he is not a clinician and has not discussed known mesh implant risks with patients nor observed those complications in patients firsthand. Dr. Iakovlev's experience as a pathologist does not appear to qualify him to opine about the specific risks of implanting mesh and whether those risks appeared on the relevant IFU; Defendants' motion is therefore granted as to those opinions.

### CONCLUSION

IT IS THEREFORE ORDERED that Defendants' motion in limine no. 15 (doc. 103) is GRANTED. Defendants' motions to limit the expert testimony of Doctors Kohli and Iakovlev (docs. 102, 106) are GRANTED in part and DENIED in part.

SO ORDERED.

Entered this 31st day of August 2022.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
